Carl TURNER, Plaintiff,

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 4:01 CV 90659.**

United States District Court, S.D. Iowa, Central Division.

April 18, 2006.

Christopher D Hagen, U S Attorney's Office, Des Moines, IA, for Commissioner of Social Security, Defendant.

Niki Adalene Fisher, Max Schott & Associates, Des Moines, IA, Thomas A Krause, West Des Moines, IA, Steven C Jayne, Des Moines, IA, for Carl Turner, Plaintiff.

## ORDER

PRATT, District Judge.

Plaintiff, Carl Turner, filed a Complaint in this Court on November 15, 2001, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for Social Security Disability benefits on October 13, 1999, claiming to be disabled since January 22, 1999. Tr. at 46–48. Plaintiff, whose date of birth is June 6, 1944 (Tr. at 46), was 56 at the time of the hearing. Plaintiff was last insured to receive disability benefits at the end of December, 2004. Tr. at 67. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge

Andrew T. Palestini (ALJ) on February 1, 2001. Tr. at 260–84. The ALJ issued a Notice Of Decision—Unfavorable on June 16, 2001. Tr. at 13–25. After the decision was affirmed by the Appeals Council on October 16, 2001, (Tr. at 6–8), Plaintiff filed a Complaint in this Court on November 15, 2001. Clerk's 1. On February 1, 2002, before answer was filed, Defendant moved for a remand pursuant to sentence 6 of 42 U.S.C. § 405(g). Clerk's 3. The Commissioner stated that she was unable to locate the Administrative Record of the case. The Commissioner further stated that on remand, she would continue to search for the record, and that if it could not be located, it would be reconstructed. Clerk's 4. The Motion was granted February 5, 2002. Clerk's 5. On April 4, 2005, Defendant moved to reopen the case. Clerk's 7. The Motion was granted April 5, 2005. Clerk's 8. The Commissioner's Answer and a Transcript were filed April 5, 2005. Clerk's 9 & 10. New counsel appeared December 1, 2005. Tr. at 11. Plaintiff filed his brief February 6, 2006. Clerk's 18. Defendant filed her brief March 22, 2006. Clerk's 19. The case is now fully submitted.

Following the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. At the second and third steps the ALJ found that Plaintiff has severe impairments that do not qualify for benefits at the third step of the sequential evaluation. Tr. at 20. At the fourth step, the ALJ found that Plaintiff has the following residual functional capacity:

> He is able to perform jobs that require limited physical and emotional stress and limited stressful interaction with others. He is able to recall brief segments of information but could not handle receiving multiple verbal messages at the same time. He could follow a three step auditory command. He should not have to do work requiring good short-term memory for information. He has significant word-finding problems when speaking and there is some dysarthria[1] of his articulation and rate of speech as noted in his testimony. He has difficulty organizing thoughts into a written word and should not have to perform more than simple calculations.

With that residual functional capacity, the ALJ found that Plaintiff is unable to do his past relevant work. At the fifth step of the sequential evaluation, the ALJ found that Rule 201.28 of the medical vocational guidelines and the testimony of a vocational expert support a finding that there are jobs which can be done within the aforementioned residual functional capacity. Examples of such jobs are gate guard and security guard. The ALJ found that Plaintiff was not disabled and not entitled to the benefits for which he applied. Tr. at 21.

## MEDICAL EVIDENCE

On February 18, 1997, Plaintiff was seen for a physical examination by J. Douglas Watts, M.D. at the Indianola Integra Health Clinic. It was noted that Plaintiff had a cerebral vascular accident in 1992. He had fully recovered, but said that his memory was not as good as before the stroke. Plaintiff, who worked as a deputy sheriff, was taking medication for hypertension and, occasionally, for anxiety. Tr. at 139.

---

1. "A disturbance of speech due to emotional stress, to brain injury, or to paralysis, incoordination, or spasticity of the muscles used for speaking". Stedman's Medical Dictionary, 27th Edition.

Plaintiff saw Dr. Watts on March 4, 1997, after injuring his shoulder while at a fire. The diagnosis was left shoulder strain. Tr. at 137.

On April 1, 1997, Plaintiff sought the advise of Dr. Watts regarding his use of Buspar, the anti-anxiety medication. Plaintiff was using the medication more because of marital discord. The doctor told Plaintiff he could use the medication up to three times per day. Tr. at 136.

On December 15, 1998, Plaintiff complained to Dr. Watts about chest tightness. Plaintiff said that when he walked in cold air, he felt as though someone was pushing on the front of his chest. Plaintiff was walking about 3 miles, 3 or 4 times per week. He was also riding an exercise bike which did not produce any chest pain. Because of Plaintiff family history of hypertension and obesity, the doctor ordered a treadmill and an EKG. Tr. at 141. The treadmill and stress echocardiogram, dated December 29, 1998, was markedly abnormal and indicative of lateral and inferior ischemia. Tr. at 143.

Plaintiff saw Mark G. Nelson, M.D. at Iowa Methodist Medical Center on January 21, 1999, for a consultation regarding triple vessel coronary artery disease with unstable angina. Tr. at 146–49. After the examination and review of the studies, Dr. Nelson advised surgery which was scheduled for January 22, 1999. Tr. at 149. As noted above, this is the date of the alleged onset of disability. The surgery was performed as scheduled, and Plaintiff was discharged from the hospital on January 26, 1999. Tr. at 150–56. On discharge, he was advised to maintain a heart-healthy, and a diabetic diet. He was also advised not to lift over 10 pounds or to drive for one month. Medication were one aspirin daily, BuSpar, vitamin E and multivitamins and Darvocet for pain. Tr. at 151.

Dr. Nelson completed a disability claim form for Plaintiff on January 25, 1999. He opined that Plaintiff was classified as having a severe limitation of functional capacity and was incapable of minimal activity. The doctor also opined that Plaintiff was unable to engage in stress situations or engage in interpersonal relations. He also indicated that a fundamental change was expected in 1 to 3 months. Tr. at 169–71

Plaintiff saw Dr. Watts on February 3, 1999. Plaintiff was described as doing well following his surgery. Plaintiff was walking 15 to 20 minutes per day. He complained of some chest incision pain and the doctor noted some swelling in the right leg, but "generally feeling much better than previously." Tr. at 187. On March 12, 1999, Dr. Watts noted a six pound weight gain, and that Plaintiff was having increasing problems with fatigue and some shortness of breath. Plaintiff reported some ankle edema for which the doctor prescribed Lasix. Tr. at 185. Plaintiff told Dr. Watts that he was doing much better when he was seen on March 26, 1999. No ankle edema was seen so the doctor discontinued the Lasix. Tr. at 184. Plaintiff was seen by a physician assistant on April 29, 1999. His blood pressure was up (166/86), and he stated that he did not feel well. Plaintiff reported increase in fatigue and a decrease in exercise tolerance. He said that exercise caused shortness of breath or chest pain. Plaintiff was reassured that no acute abnormalities were seen. Tr. at 183. On May 6, 1999, Plaintiff told Dr. Watts that he continued to feel somewhat tired and worn out. Plaintiff's blood pressure was elevated at 160/100. Tr. at 180. On May 17, 1999, Plaintiff reported that he had seen Dr. Stark on the 14th. The doctor changed one of Plaintiff's medications and he reported feeling less tired and less puffy after the change. Tr. at 179.

Dr. Watts wrote to Plaintiff's attorney on May 17, 1999. He said that Plaintiff had problems with situational anxiety since 1997 for which he had been on BuSpar. The doctor said that Plaintiff's anxiety had worsened since his coronary artery surgery. He opined that the anxiety would cause difficulty working as a sheriff's deputy. Tr. at 178.

In a letter dated June 9, 1999, Craig A. Stark, M.D., of the Iowa Heart Center, wrote a letter to Plaintiff's attorney in which he stated that there was no cardiac disability which would prevent Plaintiff from returning to work. Tr. at 166.

On June 28, 1999, Dr. Watts saw Plaintiff for a complete physical examination. Plaintiff reported feeling tired. Plaintiff said that he did not like one of his medications, Diovan—HCT, which the doctor changed to Corgard. Tr. at 174–75.

On July 6, 1999, Plaintiff was seen for a psychiatric evaluation by Hector W. Cavallin, M.D. Tr. at 157–59. The doctor pointed out that in spite of a relatively uneventful recovery from the heart surgery, Plaintiff·was tired most of the time, slept poorly, has chest pain, emotionally labile, and did not think he could tolerate the stress of his job as a deputy. Plaintiff complained of memory loss and that was apparent to Dr. Cavallin during the examination. The doctor had reviewed the medical records, and when he asked Plaintiff about events subsequent to the stroke, he was not able to answer. Plaintiff was able to recall events which happened before the stroke. Plaintiff ·also had lost some capacity to write which made it difficult for him to do his job. Tr. at 157. The doctor wrote that it was not unusual for a 55 year old man to be unable to return to work after by-pass surgery despite a good physical recovery. The doctor wrote:

It is reported that approximately one third of patients of Mr. Turner's age do not return to work following coronary by-pass in spite of good physical recovery. Often they develop a psychiatric syndrome characterized by depression, anxiety and phobic fears of further heart problems. It should be noted that prior to the surgery Mr. Turner was laboring under stress because of brain damage following the stroke in 1992.

Tr. at 157–58. Dr. Cavallin wrote that Plaintiff denied being depressed even though he exhibited several signs and symptoms of depression. The doctor concluded his report by stating his opinion that Plaintiff's capacity to deal with work stress was poor; to function independently was fair; to deal with the public and co-workers was poor; to maintain attention and concentration was poor; to understand, remember and carry out complex or detailed job instructions was poor; to behave in an emotional stable manner was fair; to demonstrate reliability was poor; to relate predictably in social situations was fair; to use judgement and follow work rules was fair. The doctor said Plaintiff's condition was chronic and not expected to improve. Tr. at 158–59.

On July 12, 1999, Plaintiff was seen by Wm. C. Koenig, Jr., M.D. for an independent medical evaluation. Tr. at 160–62. The doctor stated that he had reviewed 90 pages of medical information. Plaintiff complained of continual fatigue. He said that any physical activity causes him to tire and give up doing it. As an example, Plaintiff said that he cannot play a round of golf without suffering fatigue. Plaintiff reported impaired coordination and difficulty with cognitive function. He said that his coordination and cognitive function were both impaired. He said that he often had difficulty finding words he wants to say and often uses substitutions. Tr. at 160. On physical examination, the

doctor wrote: "The patient is very slow and deliberate in the course of the examination and speaks in short sentences with frequent pauses. There is hesitancy to his speech and at times circumlocution. He is mildly dysarthric and I believe the patient is demonstrating examples of word finding difficulties." Plaintiff was able to answer questions which tested simple cognitive function and did not appear unduly depressed. Tr. at 161. Based on his examination and on his diagnosis of recent cerebral vascular accident associated with coronary artery bypass graft surgery, the doctor opined that Plaintiff was incapable of performing the job of deputy sheriff. Dr. Koenig recommended an evaluation by a speech pathologist. Tr. at 162.

Plaintiff also saw Dr. Watts on July 12, 1999, for a recheck of his hypertension. Blood pressure was 142/82. Tr. at 173.

On August 2, 1999, Plaintiff underwent an evaluation by Paulette Wood, M.S., Speech–Language Pathologist at Iowa Methodist Medical Center in Des Moines, Iowa. Plaintiff was administered the Ross Information Processing Assessment, the Boston naming Test, the Test of Intelligibility of Dysarthric Speech, and was asked to write a narrative paragraph. Tr. at 163. The evaluation demonstrated significant communication impairment. Ms. Wood wrote: "The effects of his aphasia, dysarthria, and memory deficits represent a disabling circumstance." She opined that if Plaintiff were to attempt to work as a law enforcement officer, he would not be able to perform the verbal or written duties of the job. Tr. at 164.

On August 20, 1999, Dr. Watts, wrote that he was of the opinion that Plaintiff was not capable of doing the duties of a deputy sheriff. The reasons for this opinion were Plaintiff's speech and communication problems which had been present since the stroke. Plaintiff also had long standing anxiety which began with the stroke and intensified after the heart attack. Tr. at 172.

In a letter dated August 23, 1999, Dr. Stark wrote that he was unable to comment on the opinions of Dr. Cavallin or Dr. Koenig because their opinions were outside the scope of his medical speciality and expertise. Tr. at 165.

On September 28, 1999, Dr. Watts saw Plaintiff who reported that he had been very tired and had not been able to exercise more than once or twice per week. Plaintiff had gained 23 pounds since his last visit. Dr. Watts had a 20 minute discussion with Plaintiff during which he stressed the importance of diet and exercise. Tr. at 171.

On November 1, 1999, Dr. Stark wrote to the Social Security Administration that there were no physical limitations related to Plaintiff's open heart surgery. Tr. at 189–90.

Plaintiff was seen for a psychological evaluation by Raymond Tibe, Psy.D. on December 20, 1999. Tr. at 192–94. Although Dr. Tibe saw no evidence of disordered thought, he noted that Plaintiff was easily confused and needed a great deal of time to process things. Plaintiff was unable to do serial 7s and could only do serial 3s with much time and effort. Plaintiff was not able to remember 3 items after 5 minutes. Proverbs were concrete. Plaintiff's mood and affect were depressed. Tr. at 193. Dr. Tibe opined that Plaintiff would have difficulty learning new things. He said that Plaintiff's ability to process new instructions, procedures and locations would be limited. "He is depressed and I think there will be many times when he will not keep up." The doctor said that Plaintiff gave the impression of being a genuinely friendly person and that his basic judgment was intact. Tr. at 194.

On January 4, 2000 (Tr. at 211), after reviewing the available medical records (Tr. at 209), David G. Beeman, Ph.D. opined that Plaintiff would often have deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. Dr. Beeman also said that there were one or two episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from the situation or to experience exacerbation of signs and symptoms which may include deterioration of adaptive behaviors. Tr. at 218.

On March 30, 2000, Dr. Stark, M.D., wrote to Disability Determination Services in response to a request for information. Dr. Stark stated that his only examination of Plaintiff was on January 10, 2000, at which time he saw him for hypertension and hyperlipidemia. Plaintiff told Dr. Stark that he was doing well and was able to walk at least three miles daily with no problems. Tr. at 220. Plaintiff denied any symptoms of angina or exercise intolerance. The doctor wrote: "Mr. Turner has no restrictions in lifting and carrying. I see no restrictions in crawling, climbing, kneeling, or stooping. There would be no restrictions in handling, seeing, hearing, speaking, or traveling within the realm of immediate medical care. His work environment should be free of dust, fumes, temperature extremes, and other environmental hazards." Tr. at 221.

On a form identical to the one completed by Dr. Beemen, Herbert L. Notch, Ph.D. opined that Plaintiff had never experienced episodes of deterioration or decompensation. Dr. Notch did agree, however, that Plaintiff would often have deficiencies of concentration, persistence or pace. Dr. Notch also stated that Plaintiff had moderate difficulties in maintaining social functioning, and moderate restriction of activities of daily living. Tr. at 243.

In a letter dated August 13, 1999, Dr. Koenig wrote that he had reviewed the report of the speech language pathologist. The doctor stated that the report indicates that the patient does demonstrate significant communication impairment involving aphasia, dysarthria, and memory deficits. The doctor opined that because of those deficits, Plaintiff would be unable to serve as a deputy sheriff. Tr. at 256.

## ADMINISTRATIVE HEARING

At the hearing of February 1, 2001, Plaintiff testified that he had worked as a deputy sheriff for 26 years. He stopped working in that capacity in January 1999. In 1992, he was off for 3 or 4 months because of his stroke. Tr. at 263. He left work in 1999 because of his heart attack and surgery. Tr. at 264.

Plaintiff testified to problems with his short term memory. Tr. at 265.

When asked what he did during the day, Plaintiff responded: "Just hardly nothing." He said that once in a while he will have coffee with his friends with whom he worked. Tr. at 270. Plaintiff said he did some yard work for his mother and his girl friend. Plaintiff said that he cannot do things in a hurry because he makes mistakes when he does. Tr. at 271.

After Plaintiff testified, the ALJ called Brian Paprocki to testify as a vocational expert. Tr. at 272. The ALJ asked the following hypothetical:

I'd like the vocational expert to consider what effect it would have on the claimant's ability to perform work activity if I found that he should be in a job that required limited physical and emotional stress and also limited stressful interaction with others. That he is able to recall brief segments of information but could not handle receiving multiple verbal messages at the same time. He

could follow a three-step auditory command, but he should not have to do work which requires good short-term memory for information. That he does have significant word-finding problems when speaking. That there is some dysarthria of his articulation and rate of speech, as noticed in his testimony. That he would have difficulty organizing thoughts into written word. That he should not have to perform more than simple calculations.

Tr. at 273. The vocational expert testified that Plaintiff would be unable to do his past relevant work, but that he had skills which would transfer to low level semi-skilled jobs such as a gate guard or security guard that did not require the use of weapons. Tr. at 274. The vocational expert went on to testify that with the limitations noted and the fact that Plaintiff has a 12th grade education, there would be unskilled jobs available such as that of a library page. Tr. at 275. The vocational expert also mentioned jobs such as various kinds of assemblers of small items such a eye droppers, lamp shades, or fishing reels. Tr. at 276.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a

contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975). *See also Patrick v. Barnhart,* 323 F.3d 592, 595 (8th Cir.2003).

■ A denial of benefits for a claimant who suffers from exertional and nonexertional impairments, or from nonexertional impairments alone, must be based on the testimony of a vocational expert. *McCoy v. Schweiker,* 683 F.2d 1138, 1148 (8th Cir.1982)(en banc). The vocational expert's testimony must be in response to a properly formulated hypothetical question which relates with precision the claimant's physical and mental impairments and limitations. *O'Leary v. Schweiker,* 710 F.2d 1334, 1343 (8th Cir.1983). When a hypothetical question does not encompass *all* relevant impairments, the vocational expert's testimony does not constitute substantial evidence. *Hunt v. Massanari,* 250 F.3d 622, 626 (8th Cir.2001) (emphasis added).

■ In the case at bar, Plaintiff suffers from the effects of a stroke and the after effects of open heart surgery. Plaintiff was treated for anxiety, and, at some point, he developed depression. The doctors who treated, examined, or reviewed the records, all commented on the severity

of Plaintiff's impairments. The ALJ's hypothetical is deficient in that it did not encompass the effects of all of Plaintiff's impairments.

Dr. Watts frequently noted Plaintiff's fatigue. A hypothetical question, therefore, that does not include fatigue and the need for rest periods, cannot constitute substantial evidence to support a denial of benefits. *See Ness v. Sullivan,* 904 F.2d 432, 436 (8th Cir.1990)( failure to include rest periods in his hypothetical forecloses the use of the vocational expert's testimony as substantial evidence).

The hypothetical question also did not encompass the effects of Plaintiff's depression noted by most, if not all, of the medical records. Dr. Cavallin noted that Plaintiff's depression was chronic and not expected to improve. The effects of the depression were noted by Dr. Cavallin, Dr. Tibe, and the reviewing psychologists Dr. Beemen and Dr. Notch. All of these limitations are consistent and must be included in the hypothetical. Depression and its effects were all present before the expiration of Plaintiff's insured status at the end of 2004.

█ Although a remand for further administrative development will result in further delay, the record as is currently developed is not sufficient for the Court to award benefits. It would be speculation, at best, for the Court to predict the testimony of the vocational expert. This is not the role of a reviewing court. In *Seavey v. Barnhart,* 276 F.3d 1, 12 (1st Cir.2001), the Court wrote that an award of benefits is appropriate when the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability. However, the Court went on to write: "When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for it action the reviewing court ordinarily should remand the case to the agency." *Id.* Because testimony of the vocational expert, either on direct, follow-up, or cross examination, did not include consideration of all of Plaintiff's impairments and limitations, a remand is necessary.

The Court is aware that this case has been in the system far too long. Seven years have passed since Plaintiff first filed his application for benefits. In *Snead v. Barnhart,* 360 F.3d 834, 835–36 n. 1, (8th Cir.2004), Judge Bright wrote:

> Unfortunately, we must begin this decision with an explanation for a delayed decision in this case. Docket records show that Snead properly appealed the district court's decision on April 23, 2001. However, a communication failure between the district court and this court caused this case to sit in limbo for over two years, until it finally received an appellate docket number on June 3, 2003. Our decision today comes just over seven full years after Snead first lost his benefits. As the Third Circuit has recently stated, "It should go without saying, but apparently bears repeating, that claimants seeking Social Security disability benefits deserve better." *Cadillac v. Barnhart,* 84 Fed.Appx. 163 (3rd Cir.2003)(unpublished)(collecting cases of excessive delay). *See also Ingram v. Barnhart,* 303 F.3d 890, 894 (8th Cir.2002)(considering a social security claim that had received "inexcusably slow" treatment); *Marsh v. Omaha Printing Co.,* 218 F.3d 854, 856 (8th Cir.2000)(noting the "harsh" result where a delay in processing a Social Security claim led to the claimant's loss of health insurance); *Schoolcraft v. Sullivan,* 971 F.2d 81, 86 (8th Cir.1992)(describing generally the ill effects of delaying social security benefits).

Nevertheless, in spite of the amount of time involved, the Court in *Snead,* found it

necessary to remand for a fully and fairly developed record.

## CONCLUSION AND DECISION

The final decision of the Commissioner is not supported by substantial evidence on the record as a whole. The case, therefore, is remanded.to the Commissioner for further administrative proceedings consistent with this opinion. The Clerk will enter judgment accordingly.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[2]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa July 15, 2005).

IT IS SO ORDERED.

---

**2.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."